## Tom Turney *v*. The State.

1. **Theft — Evidence.** — In a trial for theft of a bale of cotton, an accomplice witness testified that he knowingly aided the defendant to carry the cotton to a market, but on cross-examination denied that in his presence, and while *en route* with the cotton, the defendant told one T. that he (the accomplice witness) owned the cotton, and had employed him (the de-

fendant) to sell it.   The defence proposed to prove by T. that the defend-
ant did make the predicated statement in the presence of the accom-
plice witness, but the proof was excluded on objection by the State.
*Held*, error.   The proof was admissible, not only for the purpose of con-
tradicting and impeaching the accomplice witness, but also as part of the
*res gestæ.*

2. SAME. — On cross-examination of the accomplice witness, he was asked if
he, while in custody for the same theft, did not make to one B. a certain
statement contradictory of his testimony.   *Held*, error to exclude the
answer on a general objection by the State.

APPEAL from the District Court of Robertson.   Tried be-
low before the Hon. S. FORD.

The indictment charged the appellant with the theft of a
bale of cotton belonging to the Houston and Texas Central
Railway Company, on December 5, 1879.   The jury found
him guilty, and assessed his punishment at five years' con-
finement in the penitentiary.

Dan Gray, the principal witness for the State, testified
that on or about December 8, 1879, the defendant pro-
posed to him that they should go together that night, and
defendant would steal a bale of cotton and pay witness
$5 to help him haul it to the town of Bremond.   Witness
consented, and they left Bremond together.   By agree-
ment, they were to meet that night on the railroad, about
two miles from where witness lived.   The defendant went
to Dock Overstreet's and borrowed a wagon, and about
eight o'clock in the night witness went and got it.   Wit-
ness did not go to the place agreed upon, but the defendant,
about one o'clock in the night, came and woke him up, and
they harnessed the team to the wagon and drove to the rail-
road.   Near the railroad track they found a bale of cotton,
which the defendant said he had thrown from the train.   On
account of a gully, they had to roll the bale about a hun-
dred and fifty yards before they could get it to the wagon.
About five o'clock in the morning they started for Bre-
mond, which was five or six miles distant.   After they had
proceeded about a quarter of a mile, witness left the wagon

and the wagon-road, and walked to Bremond upon the railroad track. He got there about sunrise, and directly afterwards the defendant came in with the wagon and the bale of cotton. Witness did not go about the defendant until after the latter had disposed of the cotton. When they put the bale on the wagon, the defendant took out his knife and cut the end of the bale on which the mark was. The other end of the bale was patched. After the defendant sold the cotton, he paid the witness only $1. Some days afterwards, witness saw the bale in Bremond and pointed it out to Capt. Price, being able to identify it by one end being patched and the other one cut out.

On his cross-examination, the witness stated that he was under indictment for the theft of the same cotton, but that Capt. Price had not promised him anything to testify in this case. In reply to a specific inquiry, he stated that he did not go with the defendant on the wagon a greater distance than a quarter of a mile from where they got the cotton; that he was not with the defendant a, mile or half a mile from Bremond, and did not meet John Tatum on the road, or hear any conversation between John Tatum and the defendant.

H. Schmit, for the State, testified thât about sunrise on the 9th of December, 1879, the defendant drove a two-horse wagon to the witness's store in Bremond. There was a bale of cotton on the wagon, and the defendant offered to sell it to witness, who, when shown a sample by defendant, offered him $10\frac{3}{4}$ cents per pound. The defendant agreed to take the price offered, and the bale was unloaded from the wagon. But when the witness came to examine the bale he considered that it looked suspicious, one head being entirely cut out and the other one patched. He called the attention of the defendant to the condition of the bale, who said that the cows had eaten the head out of the bale while it was at the gin, and he had trimmed it with his knife. Witness refused to take the cotton. The defendant asked the

witness at what price he would take it, and witness replied that he would not take it at any price.  Then the defendant asked witness to refer him to some other cotton-buyer, and the witness referred him to Mr. J. S. Williams, another merchant at Bremond, and furnished a hand to help the defendant reload the bale on the wagon.  The defendant then drove off with it.  No other person was in company with the defendant.  Witness afterwards saw the same bale at Williams'.  It was worth from $40 to $45.

C. Williams, for the State, testified that he was a conductor of a freight-train upon the Houston and Texas Central Railway.  On the night of the 8th of December, 1879, he missed at Bremond a bale of cotton which was on his train at the preceding station.  He notified the agent at Bremond of the loss of the bale.

D. J. Kearney, for the State, testified that he was the agent at Bremond of the Houston and Texas Central Railway Company.  He saw the bale of cotton at Williams' pointed out by the witness Gray from among a number of other bales.  One head of the bale had been cut out and the other was patched.

John Price, for the State, testified that he was a detective in the employ of the Houston and Texas Central Railway Company, and was present when the witness Gray identified a bale of cotton at Williams' as the bale taken by him and the defendant from the railway company.  On cross-examination, the witness stated that he had promised the witness Gray to use his influence to make this case go as light as he could with him, said Gray, but had never promised him immunity.

The defence introduced John Tatum, who testified that early in the morning of December 9, 1879, and about a mile from Bremond, he met the State's witness Gray driving a two-horse wagon, in which there was a bale of cotton, upon which was seated the defendant.  As will be seen in the opinion, this witness was not permitted to prove the colloquy

between him and the defendant relative to the bale of cotton.

Dock Overstreet, for the defence, testified that it was the State's witness Gray who came to his house and borrowed his wagon, and not the defendant, as testified to by Gray. Witness did not see or hear of the defendant on that occasion. Gray borrowed the wagon for himself.

The defence introduced a witness who was acquainted with the defendant's general character for honesty, where best known, and who pronounced it good; and also introduced two witnesses who knew Dan Gray's general character for honesty and truth, and who pronounced it very bad.

*W. H. Hamman*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

White, P. J. On the trial, the prosecution introduced and mainly relied upon the testimony of Dan Gray, a confessed *particeps criminis*. Whilst on his cross-examination as a witness, Gray was asked by defendant's counsel "if he did not, while driving the wagon and cotton into Bremond, while the defendant was riding on the bale of cotton, about a half a mile from town, meet one John Tatum, and if the defendant did not tell Tatum that it was a bale of cotton of witness's, and that he had been employed to sell it for him (witness)?" To which the witness replied that he did not go on the wagon with defendant more than a quarter of a mile from where they loaded the bale; that he was not with him when he was a mile or a half a mile from Bremond; did not meet John Tatum on the road, and heard no conversation between Tatum and defendant at all.

Tatum, being introduced as a witness for defendant, after testifying that he had met defendant and Dan Gray about one mile from Bremond, about eight o'clock, on or about the 9th of December, 1879, and that Dan Gray was driving

a two-horse wagon pulled by two horses, with one bale of cotton in said wagon, and defendant sitting on said bale of cotton, was then asked if the defendant did not tell him (Tatum) that the bale of cotton was the property of Dan Gray, and that Dan had employed him to sell it for him. The State objected to the evidence, and the objection was sustained and the evidence excluded, as shown by defendant's third bill of exceptions.

This was error. A proper predicate for its introduction had been laid, as seen above, and defendant was not only entitled to the evidence, as tending directly to impeach the witness Gray, but the evidence as to the declarations of defendant in the presence and hearing of the witness Gray about the latter's ownership of the bale of cotton, and the relations defendant sustained to it, which declarations were not at the time denied or disputed by Gray, was legitimate testimony in behalf of defendant.

Another error is disclosed in defendant's fourth bill of exceptions. "Defendant asked the witness Gray if, while in jail, confined under an indictment for the theft of this same bale of cotton, he (the witness) did not state to Ben Brown that the bale of cotton was his and not Turney's, and that he had raised the same on Marion Wyatt's place?" An objection to this evidence on the part of the State was also sustained by the court. The evidence was legitimate, and should have gone to the jury. We can see no reason for its exclusion.

Other errors are complained of, but not deemed by us tenable. Because the court erred in refusing the introduction of the proposed testimony in the two instances above noted, the judgment is reversed and the cause remanded.

*Reversed and remanded.*